# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Military Aircraft Parts | ) ASBCA No. 59978 |
| | ) |
| Under Contract No. SPM4A7-11-M-T291 | ) |

APPEARANCE FOR THE APPELLANT:  Mr. Robert E. Marin
    President

APPEARANCES FOR THE GOVERNMENT:  Daniel K. Poling, Esq.
    DLA Chief Trial Attorney
    Edward R. Murray, Esq.
    Jason D. Morgan, Esq.
    Trial Attorneys
    DLA Aviation
    Richmond, VA

## OPINION BY ADMINISTRATIVE JUDGE CLARKE
## PURSUANT TO BOARD RULE 12.2

This is a Rule 12.2[1] expedited appeal. Military Aircraft Parts (MAP) appeals the termination for default of its contract with the Defense Logistics Agency (DLA) for certain aircraft ducts based on DLA's disapproval of MAP's first articles. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. We sustain the appeal.

## FINDINGS OF FACT

1. MAP was awarded Contract No. SPM4A7-11-M-T291 on 11 August 2011 in the amount of $25,565. The contract required MAP to manufacture one first article (FA) and seven production welded aluminum air duct assemblies part No. 16Y226-1. (R4, tab 1 at 1, 3, 8, 9) The contract included FAR 52.209-4, FIRST ARTICLE APPROVAL – GOVERNMENT TESTING (SEP 1989); and FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE (APR 1984) (R4, tab 1 at 14, 16). FAR 52.209-4(h) provides that a first article may be approved, conditionally approved or disapproved. It also states, "Before first article approval, the acquisition of materials or components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of

---

[1] The Contract Disputes Act, implemented by Board Rule 12.2, provides that this decision shall have no value as precedent, and in the absence of fraud, shall be final and conclusive and may not be appealed or set aside.

the Contractor." FAR 52.249-8 allowed the government to terminate the contract for default if the contractor failed to deliver the supplies within the time specified and if later determined that the contractor was not in default or its default was excusable, the termination is converted to one for the government's convenience.

2. The assembly drawing for this part is 16Y226, "DUCT, MANIFOLD-CABIN AIR" (app. supp. R4, tab 102). Relevant drawing notes are:

> 1. WELD PER M105. INSPECT WELDS PER FPS-1097, CLASS III.
>
> 2. MANUFACTURING PROCESS TEST, PROOF TEST -1 ASSY TO 25 PSIG AT ROOM TEMPERATURE. NO LEAKAGE OR PERMANENT DEFORMATION ALLOWED.

(*Id.*) Drawing 16Y226 also specifies dimensions that the duct assembly must meet with general tolerances of ".XX +/- .03, .XXX +/- .010, .X +/- .1" (*id.*). These were referred to as "default tolerances" that were to be used on dimensions shown on the drawings (tr. 1/134, 271-72, 2/69). FPS-1097, CLASS III, requires that weld inspection shall be conducted in accordance with paragraph 3.2.3 (app. supp. R4, tab 103 at 28) that requires visual inspection to be performed in a "well-lit area with light intensity of 75 ft-candle or higher and at a magnification not higher than 10X" (*id.* at 20).

3. Drawing 16Y226 calls out a total of four couplings identified on the drawing as C7551-3-16, C7551-3-40 (two places), and C7551-3-48 (app. supp. R4, tab 102). The drawing for the parts, drawing C7551, "COUPLING, FLEXIBLE, FIXED CAVITY," identifies dimensions for these couplings in Table 3 as follows:

| LM AERO SIZE DASH NO b | NOM TUBE OD (REF) | C DIA MAX | D MIN | K DIA MAX | X DIA +/- .002 |
|---|---|---|---|---|---|
| -16 | 1.000 | .935 | .684 | 1.273 | 1.263 |
| -40 | 2.500 | 2.435 | .709 | 2.813 | 2.806 |
| -48 | 3.000 | 2.935 | .709 | 3.313 | 3.306 |

(R4, tab 30, sheet 5) The "K DIA MAX" does not have a +/- tolerance because it is a maximum dimension (tr. 1/218).

4. MAP submitted an FA 31 May 2013 that was disapproved on 20 June 2013 (R4, tab 10 at 2 of 3). The disapproval was based on a list of six discrepancies

summarized as follows: the 1.32-inch dimension on assembly drawing 16Y226 was out-of-tolerance; three dimensions on coupling drawing C7551 were out-of-tolerance after welding; weld penetration at Joint 23 was too thick; and there was no pressure test certification (R4, tab 10 at 4). In forwarding the FA test results to DLA, Mr. Lewis, FA program manager, Hill Air Force Base (AFB), Utah, wrote, "A resubmittal will be required" (*id.* at 3). This FA inspection was performed by Mr. Hamblin, dimensional technician[2] (app. supp. R4, tab 110 at 6). The government did not present Mr. Hamblin at the hearing. Mr. Schabacker, lead engineer, F-16 program office, Hill AFB, testified that flange distortion on the C7551 coupling after welding is a known condition and should be addressed in the Technical Data Package (TDP) (tr. 1/136, 143). The 16Y226 TDP in MAP's contract did not contain any information as to the acceptable change in C7551 flange dimensions (distortion) due to welding (tr. 1/143, 2/43, 47). Mr. Schabacker testified that they had the option of doing a "fit test" to see if an FA can actually be installed in an F-16, but that it is rarely done (tr. 1/147). The record, however, includes an example of where Mr. Schabacker requested a fit test for the same part from another manufacturer with out-of-round condition (app. supp. R4, tab 113 at 10). The response was, "after looking at the install of this duct and talking with a technician the install of this duct will require loosening of other attaching ducts where slight adjustments can accommodate these discrepancies. Conditional approve." (*Id.* at 9)

5. On 14 August 2013 MAP responded to the six discrepancies (R4, tab 11). It said it "re-measured with a CMM[3] and the 1.32" +/- .03" dimension was verified to be 1.3222" that met the specification. A copy of the result was attached and MAP offered to repeat the measurement with the Defense Contract Management Agency (DCMA) present. Mr. Valenzuela is an inspector at MAP with thirty years of experience (tr. 2/60). He has twenty years of experience using a CMM (tr. 2/63). He performed the CMM measurements on the disapproved first FA returned from Hill AFB (*id.*). He testified that he got good dimensions (*id.*). He inspected the welds on both disapproved FAs and thought they were acceptable (tr. 2/65). If it was a "little too thick" it could be repaired (tr. 2/65-66). The three C7551 flange dimensions are required prior to welding and the drawings have no dimension requirement for these parts after welding (tr. 2/67-68). Mr. Marin testified that the drawings listed on pages 5 to 8 of 16 of the contract apply to the duct, but that only drawings with an entry next to "TYPE NUMBER" are applicable to final inspection (tr. 2/207; R4, tab 1 at 5-8 of 16). The only drawing with an entry next to the "TYPE NUMBER" is drawing 16Y226, all the other drawings have no entry next to type number (R4, tab 1 at 5 of 16). The omission of a type number on the drawing C7551 means that it is not applicable to the final assembly (tr. 2/207; R4, tab 1 at 6 of 16). The

---

[2] The second FA was inspected by Mr. Madison, also a dimensional technician, who testified that he was not trained to inspect welds (tr. 1/16-17, 22-24). There is no evidence in the record that Mr. Hamblin is a trained weld inspector.

[3] Coordinate Measuring Machine (tr. 1/17).

3

government did not rebut this testimony. Also, Mr. Marin testified that the government could have included notice that the +/- .002 tolerance would be applied after welding in the "exceptions" section of the contract, and if they had, MAP would not have bid on the contract (tr. 2/208-09; R4, tab 1 at 3 of 16). Mr. Marin and Mr. Valenzuela testified that the default tolerances on the 16Y226 drawing only apply to dimensions actually shown on the drawing (tr. 2/69, 209). Mr. Valenzuela testified "there was no way to conceivably stop" flange distortion during welding (tr. 2/68). MAP attached a certification and picture of a pressure gage attached to the duct assembly reading 27 psi (R4, tab 11).

6. Mr. Nguyen was a certified welder working for MAP with 20 years of experience (tr. 2/81-82). He welded the first FA (tr. 2/83-84). He used a copper heat sink to minimize distortion (tr. 2/84). He was asked about the first FA test result indicating that the weld penetration at Joint 23 exceeded .08 inches. He agreed that part of the weld was a little thick but it could be ground down in 15 minutes to satisfy the government. (Tr. 2/84-85) Mr. Schabacker testified that the excessive weld penetration could be ground down but was unsure if the specification would allow it (tr. 1/203). Mr. Nguyen testified that he "cannot get" the +/- .002 tolerance on the flanges after welding but that he can hold distortion to +/- .005 (tr. 2/92). He typically sees the post-welding tolerance on assembly drawings (tr. 2/92-93).

7. During the hearing Mr. Marin testified about the six reasons for disapproval of the first FA. Number 1, the 1.32 +/- .03 measured as 1.269 was "pretty close" (tr. 2/183), but it was acceptable when re-measured at MAP after return (tr. 2/63). Number 2, the C7551 X DIA, it appears that the flange was defective when received (tr. 2/183). Numbers 3 and 4, the C7551 X DIA tolerance of +/- .002 is not on the assembly drawing and cannot be held after welding (tr. 2/183-84). Number 5, the weld aberration can easily be corrected in 15 minutes (tr. 2/184). Mr. Marin testified that in his experience with thousands of drawings, he has never seen the pre-weld dimensions imposed after weld (tr. 2/191-92).

8. On 23 August 2013 DLA responded to MAP's 14 August 2013 rebuttal to the discrepancies and did not change its findings. Concerning the flange dimensions, DLA agreed that the dimensions were at the C7551 part level not the assembly level but argued that "[h]istory shows from the many other First Articles tested that the tolerance can be maintained after the welding process." DLA did not agree to have DCMA visit MAP to witness its measurement of the 1.32" dimension. DLA required a submittal of another FA. (R4, tab 13 at 9)

9. On 27 August 2013 MAP notified DLA that it agreed to submit another FA but stated, "We are unsure if the C7551 flange dimensions can be held to a +/- .002 tolerance after weld" (R4, tab 14 at 4). In an 18 September 2013 email to DLA requesting a reduction in resubmittal cost, MAP wrote, "We still maintain our failed FA is worthy of conditional approval, as we have clearly demonstrated our ability to manufacture the

4

item.... We also maintain the C7551 flange +/- .002" tolerance after weld...is not a requirement of the finished part, drawing 16Y226-1, and thus is not a contractual requirement and an improper basis for rejection" (R4, tab 14 at 2). Bilateral Modification No. P00002, dated 16 October 2013, authorized MAP to submit a second FA sample for testing and provide consideration of $5,269.62 (R4, tab 3).

10. Mr. Marin testified that before he submitted the second FA, MAP had "ordered a quantity of materials sufficient to manufacture everything if things went right" and had welded, but not completed, approximately seven ducts (tr. 2/18-21). MAP submitted a second FA on 23 December 2013 that was disapproved on 6 February 2014. The disapproval was based on a list of 12 discrepancies summarized as follows: drawing 16Y226 dimensions 8.20, 1.32, 2.06, and 2.00 were out-of-tolerance (discrepancy numbers 1, 4, 6 & 7); tape applied to the part was two inches long but should have been four inches (discrepancy number 3); welds at two joints were defective for "large gaps" and "workmanship" (discrepancy numbers 2 & 5); drawing C7551 dimensions 1.263, 2.806, 3.306, 2.813, and 3.313 are out-of-tolerance (discrepancy numbers 8-12). (R4, tab 16 at 3; app. supp. R4, tab 111 at 4) Mr. Lewis, manager, FA Inspection, Hill AFB, compiled the discrepancy list from the inspector's information (tr. 1/77-78, 123; R4, tab 16 at 3). The second FA inspection was conducted by Mr. Madison, dimensional technician,[4] Hill AFB (tr. 1/16-17; app. supp. R4, tab 111 at 3). He is trained and certified to use the CMM (tr. 1/17). He testified that he was a dimensional inspector, not a "weld expert," but if a weld "didn't look right" he would note it on the inspection sheet as a "heads up" for someone else to inspect it (tr. 1/22-24, 34, 49, 58-59). Mr. Madison testified that he thinks an "engineer" looked at the welds (tr. 1/25). Mr. Schabacker testified that the engineers were not certified weld inspectors but he believed engineers were capable of conducting visual inspections of welds (tr. 2/26-27). DLA did not present any evidence that the welds were actually inspected by a certified weld inspector. The descriptions of the weld deficiencies on the discrepancy list Mr. Lewis provided to MAP (R4, tab 16 at 2, 3) were the same as indicated on Mr. Madison's measurement worksheet (app. supp. R4, tab 111 at 4). At the hearing Mr. Schabacker discussed the weld deficiencies in some detail and explained why he believed they were nonconforming (tr. 1/143-257). He also testified that the problem with the tape was easily fixed and would not, standing alone, justify disapproval (tr. 2/30-31).

11. On 20 February 2014, a post-welding flatness requirement was added to the 16Y226-1 drawing, "C7551 FLATNESS CALLOUT, FACE TO BE FLAT WITHIN .005 AFTER WELDING. OUT OF ROUNDNESS ON ALL DIAMETER DIMENSIONS MUST BE WITHIN +/- .005 OF NOMINAL DIMENSION AFTER WELDING." (App. supp. R4, tab 108) Mr. Schabacker testified that this was a new tolerance and MAP had no way of knowing about this change and therefore it would not apply to MAP's contract

---

[4] Mr. Madison testified he was an "engineering technician" but his signature block says "Dimensional Tech" (tr. 1/17; app. supp. R4, tab 111 at 3).

5

(tr. 1/161-62, 218-19). Mr. Schabacker also testified about the coupling assembly that clamps 16Y226 duct to connecting ducts (gov't ex. J). The relaxed +/- .005 would reduce the ability of the duct to misalign on the aircraft, but it was acceptable (tr. 1/241). He testified that out-of-tolerance dimensions on both of MAP's first and second FAs that were outside the +/- .005 would interfere with the coupling assembly and potentially have problems on the aircraft (tr. 1/234-43, 265-70). Mr. Marin testified that this was a "legitimate concern" and he didn't understand why tolerances were not on the drawing to insure this did not happen (tr. 2/274-75).

12. On 10 March 2014 MAP responded to the second FA disapproval. The response is summarized as follows: The four dimensions on drawing 16Y226 are to "locations in space" and are probably not repeatable; the two weld problems were not inspected in accordance with the applicable specification; the "4.00" True" dimension is ambiguous on the drawing and if it is a defect it is correctable in production; and the flange dimensions are at the C7551 part level and are not required after welding. (R4, tab 17 at 1, 6-8)

13. On 18 July 2014, DLA responded to MAP's 10 March 2014[5] rebuttal to the second FA disapproval. Concerning the four 16Y226 dimensions, DLA agreed that the measurements are "in space" but defended its results. Concerning the welds, DLA argued that the weld at joint 24 required weld penetration and that the "gaps" indicated a lack of penetration. Concerning the post-welding flange dimensions, DLA stated that it "clarified" post-weld dimensions and now imposed a +/- .005 tolerance on flange dimensions after welding rather than the +/- .002 tolerance on the C7751 drawing. It stated that this dimension was required for "proper fit of mating parts in the aircraft." With this relaxation of the post-weld dimensions, one of the disapproved flange dimensions was acceptable. (R4, tab 20 at 1-6)

14. On 26 September 2014, MAP responded to DLA's 18 July 2014 letter. Regarding the four dimensions on drawing 16Y226, MAP sent the two disapproved FA samples (returned from Hill AFB) to an independent laboratory, Dimensional Inspection Laboratories (DIL), Newark, California, and DIL reported both samples met the requirements for the dimensions that DLA found were out-of-tolerance. (R4, tab 21 at 1 ex. B) Regarding the two weld problems, MAP argues that DLA improperly interpreted the weld specifications and that since the majority of welds on the part were approved by DLA any problems are easily correctable in production. Regarding the tape discrepancy, MAP responded that DLA did not find the discrepancy on the first FA and that the tape location was easily correctable during production. Regarding the "clarification" increasing the flange tolerance after welding to +/- .005, MAP responded calling the "clarification" a cardinal change to its contract. (*Id.* at 2)

---

[5] The 18 July 2014 response cites a 10 June 2014 letter, but DLA's response quotes the attachment to the 10 March 2014 email (*see* R4, tabs 17, 20).

15. DLA responded to MAP's 26 September 2014 letter on 18 December 2014. DLA stated that the government first article laboratory and the Engineering Support Activity agreed that the parts are not useable, that MAP was not "the acceptance point for this part" and recommended termination for default. (R4, tab 23 at 1) DLA did not comment on the results from the independent measurements taken by DIL. Concerning welding and insulation tape, DLA would not change its conclusions but did not argue that they were not correctable. Concerning the post-welding tolerance increase (relaxation), DLA denies there has been a change to the contract requirements. (*Id.* at 2-4)

16. On 9 February 2015, DLA terminated Contract No. SPM4A7-11-M-T291 for default (R4, tab 27). On 6 May 2015, MAP appealed the termination for default, demanded $21,555.16 and elected expedited procedure under Board Rule 12.2 (Bd. file). The appeal was docketed as an expedited appeal, ASBCA No. 59978, on 8 May 2015.

17. The record contains measurements from a second independent laboratory, Dayton T. Brown, Inc. (DTB), Bohemia, New York, dated 6 March 2015, that found the four drawing 16Y226 dimensions, 8.20, 1.32, 2.06, and 2.00, to be within tolerance on both FA samples (R4, tabs 116, 127). Mr. Madison, the inspector who conducted the second FA inspection, testified that he looked at the DIL and DTB inspection results and he did not know how they performed the measurements (tr. 1/56-57). He also testified that he was not asked to contact DIL or DTB to attempt to determine how they performed the measurements (tr. 1/72). There is no evidence in the record that DLA made any effort to contact DIL or DTB to inquire about their measurements. Mr. Marin produced the two FA samples at the hearing. He marked them "Sample 1" and "Sample 2" indicating the two FAs and testified that these were the actual FAs disapproved by DLA and measured by DIL and DTB (tr. 2/251-53).

## DECISION

First articles are typically[6] not production items and as such are not "accepted" or "rejected," they are "approved, conditionally approved, or disapproved" (finding 1). The government may not disapprove an FA if the defect upon which the disapproval is based is proven to be easily correctable in production. *AYA Technology, Inc.*, ASBCA No. 44374, 95-2 BCA ¶ 27,845 at 138,862 ("It is well established that deficiencies in a first article that are easily correctable in production do not constitute a valid basis for an outright disapproval of a first article."). If disapproval is justified, FAR 52.209-4, FIRST ARTICLE APPROVAL – GOVERNMENT TESTING (SEP 1989) provides that an FA disapproved, "shall be deemed to have failed to make delivery within the meaning of the Default clause of this contract." FAR 51.209-4(d). Since this is a termination for default, it is DLA's burden of

---

[6] It is possible that a contract provides that an "approved" FA may be delivered as
   an "accepted" production unit. *Astro Science Corp. v. United States*, 471
   F.2d 624, 626 (Ct. Cl. 1973).

7

proof to establish that its disapproval of MAP's FAs and termination for default was justified. *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 15-1 BCA ¶ 35,957 at 175,707 (A termination for default is a type of forfeiture and is strictly construed. The government bears the initial burden of proof that a default termination was justified. If the government satisfies its burden of proving that the termination for default was justified, the burden shifts to the contractor to establish that its default was excusable or caused by the government's material breach, or that the contracting officer's termination decision was arbitrary, capricious, or an abuse of discretion.).

DLA argues that the fact that MAP signed Modification No. P00002 agreeing to submit a second FA (finding 9) renders the first FA irrelevant (citing *James Electronics, Inc.*, ASBCA No. 43505, 93-2 BCA ¶ 25,677). We need not reach that issue because the outcome is the same for both FAs, and thus we focus only on the second FA.

The second FA was submitted on 23 December 2013 and disapproved on 6 February 2014 (finding 10). The disapproval itemized 12 discrepancies (*id.*). Having shown 12 discrepancies, DLA met its burden of justifying the termination for default and the burden shifts to MAP to show it was not in default.

*The Drawing 16Y226 Dimensions – Discrepancies 1, 4, 6 & 7*

These discrepancies deal with four dimensions on the 16Y226 assembly drawing that DLA found out-of-tolerance (finding 10). MAP sent the first and second FA samples to two outside laboratories, DIL and DTB, for measurement and both laboratories found that the dimensions were acceptable (findings 14, 17; app. br. at 3). Mr. Marin testified that the marked samples he brought to the hearing were the same ones disapproved by DLA and sent to DIL and DTB (finding 17). We reject DLA's unsupported suggestion that MAP sent DIL and DTB two different samples (other than the ones disapproved by DLA) or that MAP somehow manipulated the results (gov't br. at 22-23). DLA/Hill AFB did not contact the independent labs to assess their results before the hearing (finding 17).[7] Thus we find credible evidence that Hill AFB's measurements were suspect and under these circumstances MAP met its burden of rebutting DLA's *prima facie* case that the four drawing 16Y226 dimensions were out-of-tolerance.

*Post-Welding C7551 Dimensions – Discrepancies 8-12*

The next basis for disapproval were coupling dimensions taken after welding (finding 10). MAP correctly points out that the assembly drawing 16Y226 does not place any dimensional requirements on the couplings after welding (finding 5; app. br. at 2).

---

[7] We reject DLA's criticism that Mr. Marin's inability to get representatives of DIL or DTB on the phone during the hearing somehow prejudiced DLA because it failed to contact these laboratories before the hearing (gov't br. at 23).

Mr. Marin testified that the fact that an entry of 16Y226 next to the "TYPE NUMBER" in section B of the contract means that the drawing is applicable to the final assembly inspection (finding 5). DLA did not explain the meaning of "TYPE NUMBER" or explain why none of the lower level part drawings were entered next to "TYPE NUMBER." DLA contends, among numerous other arguments, that drawing C7551 dimensions and tolerance of +/- .002 (where applicable) apply to the post-welding assembly level because the "C7551 specification is referenced on both the item's top-level drawing" and in the contract (gov't br. at 16).[8]

We apply well known rules of contract interpretation to resolve the question of drawing interpretation. We consider MAP's interpretation that the dimensions and tolerances on the part level drawing, C7551, do not apply to the higher level assembly drawing after welding to be reasonable. We also find that DLA's interpretation that calling out C7551 on the assembly drawing, 16Y226, should be interpreted to apply dimensions and +/- .002 tolerance after welding to be "within the zone of reasonableness."[9] *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1369 (Fed. Cir. 2009). Thus, under familiar rules of contract interpretation, we find the contract was ambiguous, the ambiguity was latent and there was no duty to inquire on MAP's part. Therefore, we apply *contra proferentem* and adopt MAP's interpretation of drawings 16Y226 and C7551. *See States Roofing*, 587 F.3d at 1372; *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1474-75 (Fed. Cir. 1997). The dimensions and +/- .002 tolerance on drawing C7551 do not apply to the 16Y226 assembly after welding. DLA's disapproval of MAP's first FA based on its failure to hold the +/- .002 and K DIA MAX was not justified and we will not sustain the disapproval on that basis.

After the second FA disapproval, DLA relaxed the post-welding tolerances increasing them from +/- .002 to +/- .005 (finding 11). Applying the relaxed +/- .005 tolerance to DLA's measurements of the second FA still results in out-of-tolerance conditions. However, the +/- .005 is not a requirement of MAP's contract. Mr. Schabacker agreed that the relaxed tolerances did not apply to MAP's contract (*id.*). DLA argues that the parts will not fit in the aircraft if +/- .005 is exceeded (*id.*). Mr. Schabacker testified that the clamp connecting the couplings will not fit over MAP's part (*id.*). MAP's contract does not define the acceptable post-weld distortion. DLA fixed this problem with the relaxed tolerance, however, the +/- .005 does not apply to MAP's contract. We concluded above that DLA's 16Y226 TDP was ambiguous and adopted MAP's interpretation. This does not mean that MAP had no limit on the post-weld

---

[8] Although Mr. Schabacker agrees with this position, he also testified "it would be up to the data package to describe any allowable distortion limits" (tr. 1/143), and there is no evidence that the data package identifies acceptable weld distortion limits.

[9] We do not find DLA's interpretation nearly as persuasive as MAP's, but that is not the test. DLA's interpretation is plausible.

distortion.[10] MAP's ducts would still have to fit and work properly on the F-16. To that end DLA had the ability to conduct a "fit test" on the aircraft or possibly with connecting parts (finding 4). In one instance documented in the record, Mr. Schabacker requested a fit test and conditional approval was recommended even though some loosening of other attaching ducts would be needed to make it fit[11] (*id.*). We do not adopt Mr. Schabacker's conclusion that MAP's ducts would not fit based simply on his testimony[12] when a more conclusive method of proving this point was available – the fit test. DLA's case for termination would be much stronger if it had conducted a fit test and conclusively proven that MAP's first FA would not fit in the F-16.

*Welds – Discrepancies 2 & 5*

DLA argues that because MAP had welded seven assemblies that "if the end items have already been manufactured, any defects discovered in the first article are not 'readily and easily correctable upon production'" (gov't br. at 10). Mr. Marin testified that MAP had partially assembled (welded) approximately seven ducts but it is unclear when (finding 10). DLA relies on *Astro Science Corp. v. United States*, 471 F.2d 624 (Ct. Cl. 1973), in support of its argument, but as MAP correctly points out in its reply brief, *Astro Science* involved a contract that provided for acceptance of the FA as a production unit; MAP's contract does not (gov't br. at 10; app. reply br. at 9-10, ¶ 18). We disagree with DLA's argument that the "easily correctable" standard no longer applies if the production quantity is completed before the FA is submitted. The FA clause does not prohibit a contractor from manufacturing the entire production quantity before submitting an FA; it places the risk on the contractor if it chooses to do so (finding 1). DLA's argument would render the option of conditional approval in FAR 52.209-4 meaningless in situations where a contractor chooses to go at its own risk – an option envisioned by the clause.

As to the actual weld discrepancies, they were cited as "large gaps" and "workmanship" (finding 10). MAP contends that if these are deficiencies they are correctable (findings 12, 14). DLA did not present any evidence that that these weld

---

[10] Mr. Marin recognized MAP was subject to some limit on distortion. During cross-examination Mr. Marin was asked if he believed he could submit a "square" flange; he replied "No, I think that would be an obvious deformation" (tr. 2/265).

[11] This notion of "loosening of other attaching ducts where slight adjustments can accommodate these discrepancies" (finding 4), which we interpret as "fiddling" to make it fit, casts doubt on Mr. Schabacker's strict dimensional analysis.

[12] We also note that Mr. Schabacker's oral dimensional analysis, in the nature of expert testimony, was not provided to MAP in writing before the hearing and MAP did not have time to prepare a rebuttal dimensional analysis.

10

deficiencies were not correctable. We agree with MAP that these discrepancies are correctable and should have been conditionally approved.

*Insulation Tape – Discrepancy 3*

The tape applied to the part was two inches long and should have been four inches long (finding 10). Mr. Schabacker testified that it was easily correctable and not a basis for disapproval (*id.*). We agree, this deficiency should have been conditionally approved.

## CONCLUSION

For the reasons discussed above, the second FA should have been conditionally approved and MAP's appeal is sustained. The termination for default is converted to a termination for convenience.

Dated: 1 September 2015

_____
CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59978, Appeal of Military Aircraft Parts, rendered in conformance with the Board's Charter.

Dated:

_____
JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

11